U.S. DISTRICT COURT
WESTERN DISTRICT OF LOUISIANA
RECEIVED

DEC 2 8 2017

TONY R. MOORE, CLERK
BY: _____
         DEPUTY

# UNITED STATES DISTRICT COURT

## WESTERN DISTRICT OF LOUISIANA

### LAFAYETTE DIVISION

| | |
|---|---|
| JOSEPH C. THIBODEAUX | DOCKET NO.: 6:13-cv-02784 |
| VERSUS | |
| ENSCO OFFSHORE CO. | JUDGE DEE D. DRELL |
| | MAG. JUDGE CAROL WHITEHURST |

## RULING

This matter involves claims brought by the plaintiff, Joseph C. Thibodeaux ("Thibodeaux"), against the defendant, Ensco Offshore Company ("Ensco"), under the Jones Act and General Maritime Law of the United States. Thibodeaux seeks damages for injuries he sustained on October 1, 2011, while serving as a deck foreman aboard the Mobile Offshore Drilling Unit Ensco Rig 90 ("Ensco 90").[1] Thibodeaux asserts negligence and unseaworthiness claims under the Jones Act and a claim for maintenance and cure under general maritime law and designates his claims as admiralty or maritime claims pursuant to Federal Rule of Civil Procedure 9(h). Jurisdiction is proper pursuant to 28 U.S.C. §1333.

## I.    PROCEDURAL HISTORY

On October 1, 2013, Thibodeaux filed a complaint against Ensco seeking damages for injuries he sustained while aboard the Ensco 90. Thibodeaux alleged he was injured as a result of Ensco's negligence and/or the unseaworthiness of the Ensco 90. On May 18, 2015, Thibodeaux amended his complaint to add a claim for maintenance and cure.

---

[1] The Mobile Offshore Drilling Unit Ensco 90 was also referred to as a "jack-up rig".

The non-jury trial of this case commenced before the undersigned on September 12, 2016. The matter was taken under advisement on September 14, 2016. The parties were ordered to file post-trial briefs which they submitted timely.

After due consideration of the facts and evidence presented by the parties at the trial of this matter through live witnesses, exhibits, and depositions testimony, and having had the opportunity to assess the demeanor of the live witnesses and review and weigh the evidence, the Court hereby makes the following findings of fact and conclusions of law pursuant to Rule 52(a) of the Federal Rules of Civil Procedure, which the Court finds and holds were established by a preponderance of the evidence, and rules as follows.[2]

## II.   STIPULATIONS AND ADMISSIONS

The parties stipulated to the following prior to trial:

1) Ensco Offshore Company was the owner *pro hac vice* and operator of the Ensco Rig 90 at all times pertinent to this litigation. As such, Ensco Offshore Company is responsible for any claim of negligence and/or unseaworthiness of the Ensco 90 in this litigation. Ensco Offshore Company will be responsible for any Judgment rendered in this matter.

2) Joseph Thibodeaux was a Jones Act seaman.

3) Joseph Thibodeaux was employed by Ensco Offshore Company as a deck foreman aboard the Ensco Rig 90, a vessel in navigation, at the pertinent time.

4) The authenticity of every document produced by Ensco Offshore Company during the pendency of this claim and lawsuit.

## III.   FINDINGS OF FACTS

On October 1, 2011, crew members aboard the Ensco 90[3] worked to prepare the rig for its move to another location. Thibodeaux was a deck foreman with the crane crew which also

---

[2] To the extent a finding of fact constitutes a conclusion of law and/or a conclusion of law constitutes a finding of fact the court adopts it as such.

[3] The Ensco 90 was a thirty year old, cantilever, "jackup", oil rig that was triangular in shape. The rig had an elevated helideck at the bow of the rig and an oil derrick on a skidding aft. Three legs ran through the main deck at

included three roustabouts, David Biggs, Aaron Allen, Bob Degner, and a crane operator by the name of Jay Puckett. The crane crew's task was lifting and storing four to five take-on hoses attached to a manifold on the port aft side of the rig. Each hose was 3 to 5 inches in diameter, weighed approximately 300 pounds, and spanned 100 to 150 feet in length. This same crane crew performed this very task together on several prior occasions, but this was the first time they conducted it on this hitch.

The crane crew met for a verbal, pre-job safety meeting and discussed the task at hand as well as the role each man played. The roustabouts rigged each hose, one at a time, to the crane line; Thibodeaux used standard hand signals to flag Puckett so he would know how and where to lift and maneuver each hose to the brackets that hung on the outside of the port aft handrail until the brackets reached capacity. Any remaining hose was laid on deck, as close to the handrail as possible so the roustabouts could tie the hose to the handrail and maintain a path on the walkway.

The crane crew neared completion of this task when the load swung left toward the port aft leg jack house. As it did so, the load came into contact with the port side navigational light assembly[4] that hung on the jack house. Within seconds of the load's hitting the light assembly, angle irons holding the assembly fell, followed by the light assembly itself. The safety cable attached to the navigational light failed to hold the entire light assembly. In falling, it struck Thibodeaux on his left hip and left knee.

Thibodeaux sustained a significant hematoma, known as a Morel-Lavallee lesion, to his hip. Though he then denied being hurt, the injury site continued to swell over the evening, so he was returned to shore for examination. Pre-employment and post-injury MRIs revealed no change

---

each point of the triangle: one at the bow, one at the port aft corner and one at the starboard aft corner. The crew "jacked up" the legs to raise the rig and lowered the legs when the rig was to be moved to a new location.

[4] The navigational light assembly consisted of the navigational light and the navigational light shield.

to Thibodeaux's back, but he complained of pain in his neck, left hip, knee and back. Within days of the accident, Thibodeaux reported his neck and knee pain had resolved and his treating physician, Dr. Franklin, noted the bruising to his hip was resolving. Other than degenerative changes, Thibodeaux's back remained unchanged for more than a year post-accident. Even when an MRI revealed that a disc bulge had herniated and a Lafayette, Louisiana orthopedist, Dr. Blanda, recommended surgery, the surgical recommendation was based on Thibodeaux's subjective complaints of pain rather than objective physical symptoms.

Post-surgery, Thibodeaux did extremely well; however, within months he began again to complain of significant pain. The court notes the timing of those complaints of pain correlated with the realization that he would no longer receive narcotic medication, upon which, according to his girlfriend, Fabian Hardy, he had become reliant. [As we will explain later, the court finds Thibodeaux's testimony as a whole to be self-serving and unsupported by record evidence.]

Regarding the accident, Thibodeaux admits he had no idea how the light assembly fell or what happened when it did. In fact, there was only one eye witness with the details needed to explain how the accident occurred, the roustabout, Biggs.[5]

Biggs testified that he maintained a good view of the load the entire time it was in motion. He saw the load barely hit the light assembly, the support irons begin to fall, followed by the light assembly. He recalled seeing Thibodeaux looking at the hoses inside the handrail with Thibodeaux's back to him, but he did not recall seeing Thibodeaux signal to Puckett in advance of

---

[5] Adam Wade Allen testified via deposition that he "had his hands full" and was not paying attention to the load. It was the sound of the block hitting metal that caught his attention and made him aware of the falling navigational light shield. Puckett's evidentiary statement to an investigator prior to his death that he was watching Thibodeaux for hand signals and could not see the load from his vantage point. Puckett also gave inconsistent statements regarding whether or not Thibodeaux had his back to the crane or whether he was giving the lower load hand signal. Leon Coleman testified that he witnessed the accident but no one else recalls him being present. Given the space limitations and the inconsistencies within his own statement, the court does not believe he actually witnessed the event.

4

the falling assembly. Although Thibodeaux claimed he never lost eye contact with the load and/or Puckett and was always facing the bow, Biggs' testimony explains why that would be the case. It further explains how the light assembly hit Thibodeaux on his left hip and knee as the jackhouse and light would have been on his left as he faced the stern of the boat. Thus, the court finds Thibodeaux was distracted by the hose that was falling into the walkway. According to the credible evidence here, he turned his back to the load and crane operator without calling a stop order and without giving any further signal after an initial slack off sign. Accordingly, Thibodeaux was unable to see the load swing into the light assembly and was unaware that it was falling.

The medical evidence establishes Thibodeaux sustained an abrasion on his left knee and severe bruising to his hip during the October 1, 2011, accident. An MRI conducted October 15, 2011, revealed the Morel-Lavallee lesion over his left lateral pelvis and hip. However, there was no change at L4-5, where he had a pre-existing, pre-employment, asymptomatic degenerative lumbar spine condition.

While Thibodeaux's knee injury and the bruising to his hip resolved within weeks of the accident, his back and hip pain continued. Accordingly, in May 2012, Dr. Louis Blanda, Thibodeaux's treating orthopedist, ordered another MRI. That MRI revealed the disc at L4-5 that previously appeared to be bulging was now herniated. The herniation was confirmed again by an MRI conducted in January 2013. Based this objective evidence and Thibodeaux's continued complaints of pain, Dr. Blanda recommended a decompression and fusion at L4-5.

At Ensco's request, Thibodeaux underwent an examination by an independent medical examiner, Dr. Neil Romero, who specialized in orthopedic spine surgery. In a report dated May 17, 2013, noted Thibodeaux denied any injuries to his back since the October 1, 2011 accident. Dr. Romero opined the worsening of the pre-existing condition of Thibodeaux's spine at L4-5 was

a result of the accident. While Dr. Romero believed that Thibodeaux should undergo an epidural injection in an attempt to avoid surgery, he agreed with Dr. Blanda's recommendation for a decompression and fusion if the pain continued. However, Dr. Romero noted the surgery would not address the hip pain as that pain was consistent with the shearing injury to his hip and the Morel-Lavallee lesion he developed.

All conservative treatments prescribed by both Dr. Blanda and Dr. Romero failed to provide lasting relief for Thibodeaux's pain. Accordingly, he underwent the decompression and fusion on July 29, 2015. However, Dr. Blanda did not perform an aspiration of the Morel-Lavallee lesion as he concurred with Dr. Romero that it appeared the fluid collection had resolved and nothing more could be done.

Based on the evidence presented, the court finds Thibodeaux reached maximum medical improvement as to his knee and bruising of his hip by October 18, 2011, the Morel-Lavallee lesion by May 17, 2013, and his back by September 13, 2016.

While the court finds Thibodeaux sustained significant injuries to his hip and back as a result of the accident, we do not find his complaints of pain and the extent of his disability to be genuine. He claimed his pain was constant and unrelenting over the course of five years and he was homebound and unable to work. Yet, he admitted to driving and/or riding in a car for long distances and he continued to visit casinos for fun. Fabian Hardy, who helped care for Thibodeaux, testified he received great results from a first facet injection, good results from the second, and did "extremely well" post-surgery, but Thibodeaux claimed he received little if any relief from the injections and reported a pain level of 7/10 after surgery and about the time Dr. Blanda was going to release him from his care.

Thibodeaux's complaints of pain to various physicians during similar time frames also support the court's finding. Though he told Dr. Franklin his neck and knee pain resolved, he reported to Dr. Blanda within the month and stated he experienced pain in those areas, at a level of 8 out of 10. He complained to Dr. Romero that his hip pain was more severe than his back pain, but complained of terrible back pain to Dr. Blanda. He also reported to Dr. Romero and his treating psychologist Dr. LeCorgne that drinking beer and alcohol eased his pain but he continued to obtain narcotic medication from Dr. Blanda. He complained of unrelenting back pain yet sought a prescription for Viagra for erectile dysfunction. Even at trial, Thibodeaux wore his back brace for one day despite Dr. Blanda's order that he discontinue use in order to build the muscles in his back.

Finally, the court turns to findings regarding Thibodeaux's emotional and mental state. The only evidence presented was from Thibodeaux's treating psychologist, Dr. LeCorgne. Dr. LeCorgne began treating Thibodeaux on March 3, 2015, nearly two and a half years after the accident and approximately six months prior to the trial date pending at that time. Though Dr. Blanda suggested that Thibodeaux speak to someone about his reported depressed mood, Thibodeaux failed to follow that advice until his attorney set up an appointment. Dr. LeCorgne was selected by Thibodeaux's attorney, and he saw Thibodeaux a total of 24 times (prior to trial). He diagnosed Thibodeaux with Post Traumatic Stress Disorder and depression related to the October 1, 2012 accident. He considered Thibodeaux's emotional state to be "stable" and his prognosis to be fair as it was tied to his "variable" physical state. As of the trial date, he thought an additional six to nine months of therapy on a once a month basis would benefit Thibodeaux in his continued recovery.

## IV.   CONCLUSIONS OF LAW

### A. Liability

### 1. Jones Act Negligence

The Jones Act, 46 U.S.C. §688, allows an injured seaman to bring an action against his employer for negligence. Becker v. Tidewater, 335 F.3d 376, 386 (5th Cir.2003).   The Jones Act employer's potential liability extends to all personal injuries arising during the course of the seaman's employment, but proof of negligence is essential to recovery.   Such negligence may arise in many ways including the failure to use reasonable care to provide a seaman with a reasonably safe place to work, the existence of a dangerous condition on or about the vessel, failure to inspect the vessel for hazards, failure to take precautions to protect a seaman, or any other breach of the duty of care. Davis v. Hill Engineering, Inc., 549 F.2d 314, 329 (5th Cir.1977) overruled on other grounds by Gautreaux v. Scurlock Marine, Inc., 107 F.3d 331, 339 (5th Cir.1997); Thomas J. Schoenbaum, Admiralty and Maritime Law, §6-21 (4th ed.2004).   This duty is absolute and non-delegable.

The duty of care owed by an employer under the Jones Act is that of ordinary prudence, namely, the duty to take reasonable care under the circumstances. Gautreaux, 107 F.3d at 338-39. "While a Jones Act employer's duty to provide a safe place for the seaman to work is a broad one, the employer must have notice and opportunity to correct an unsafe condition before liability attaches." Colburn v Bunge Towing, Inc., 883 F.2d 372, 374 (5th Cir.1989) (citations omitted). "The standard of care is not 'what the employer subjectively knew, but rather what it objectively knew or should have known.'" Id., quoting Turner v. Inland Tugs Co., 689 F.Supp. 612, 619 (E.D.La 1988).

The standard for causation in a Jones Act case is clear; "a defendant must bear responsibility for his negligence if his negligence played any part, even the slightest, in producing the injury" for which damages are sought. Landry v Oceanic Contractors, Inc., 731 F.2d 299, 302 (5th Cir.1984) citing Chisholm v. Sabine Towing and Transportation Co., 679 F.2d 60, 62 (5th Cir.1982); In re Copper/T Smith, 929 F.2d 1073, 1076-77 (5th Cir.1991). "[T]he standard is one of 'producing cause' rather than 'proximate cause' and ...the burden of proof is 'featherweight.' Thus, two concepts come into play here-the type of causation that must be shown (producing) and the plaintiff's burden to show cause (featherweight)." Clark v. Kellogg Brown & Root, LLC., 414 Fed.Appx. 623, 626 (5th Cir.2011), citing Chisholm v. Sabine Towing and Transp. Co., 679 F.2d 60, 62 (5th Cir.1982).

A seaman must act with ordinary prudence under the circumstances; thus, comparative fault may reduce recovery. Gautreaux, 107 F.3d at 339; Jauch v. Nautical Serv., Inc., 470 F.3d 207, 213 (5th Cir.2006), citing Miles v. Melrose, 882 F.2d 976, 984 (5th Cir.1989). A seaman's comparative fault will not necessarily bar his recovery, but it may reduce the amount of damages owed proportionate to his share of fault. Id. The defendant has the burden of proving a seaman was guilty of comparative negligence. Comparative negligence applies in both Jones Act and unseaworthiness actions.

Thibodeaux argues Ensco was negligent because it breached its duty to provide a safe working environment and/or practices and procedures.

### a.    Failure to provide a safe working environment

#### i.    Failure to inspect and maintain

Thibodeaux argues Ensco breached its duty to provide a safe work area and follow safe practices because it did not properly inspect and maintain the navigational light shield assembly

or the safety cable. He contends if Ensco had done so, it would have discovered that only tack welds held the light shield assembly to the jack house and the fact the cable was not strong enough to hold the light assembly given its size, condition and means of attachment.

Thibodeaux provided the expert report of Stephen Killingsworth, a mechanical engineer and accident reconstructionist. Killingsworth opined: "The attachment of the NAV light assembly to the port-aft jack house, using only tack welds, created a permanent unsafe workplace, which made the rig unseaworthy during normal operations." Killingsworth further opined the maximum additional load the NAV light assembly could withstand was far less than that calculated by one Steve Doerr.

Steve Doerr, a licensed professional engineer who retired from Ensco in October 2014, was tasked by Ensco after the accident to determine whether the manner in which the navigational light shield assembly had been re-attached to the left-aft jack house rendered it fit for service. Doerr performed various calculations in order to determine the maximum sheer factor and bending factor. Ultimately, he concluded the attachment was indeed fit for service. However, he did not calculate, nor was he asked to calculate, the maximum additional load the navigational light assembly could withstand if only held by two temporary tack welds. In fact, the record is devoid of any such calculations.

Ensco employees called as witnesses provided additional information regarding the navigational light assembly as it stood prior to the accident. Chad Bonvillan, an electrician, Barge Supervisor John Roberts, and Offshore Installation Manager Curtis Ellard all testified regarding their duties at Ensco, Ensco's safety policies and procedures, their knowledge of the accident, and the condition of the light shield assembly and safety cable. Bonvillan testified his duties included inspecting the port navigational light and the safety cable attached thereto each time the rig was

prepared for move on his hitch. Though it was not within his duty to inspect the navigational light shield and its attachment to the rig, he was familiar with it as he had leaned on it each time he checked the navigational light before the accident. At no time did he notice anything wrong with the navigational light, the light shield, the safety cable, or the area around it. He did not even notice any weakness or give in the light shield when he used it to support his weight. He testified further that had he noticed that or anything else, he would have reported it.

John Roberts reiterated the duties of the electricians (to inspect the navigational light and the safety cables attached thereto) and confirmed those inspections were conducted each time the rig moved. Mr. Roberts further advised the duty to inspect lighting fixtures and safety cables on a quarterly basis, as set forth in the applicable Dropped Object Quarterly Inspection Report, belonged to the crane operators. Mr. Roberts confirmed that he never received notices or complaints regarding the stability (or instability) of the navigational light assemblies; he had no reason to inquire into the durability of the weld; and, he had never received notice that the light assemblies fell on any similar rigs.

Evidence produced by Thibodeaux regarding the condition of the safety cable included testimony from Bonvillan and Roberts acknowledging that the cables were regularly inspected and any problems noted were addressed. Additionally, Bonvillan, a very credible witnesses, testified he examined the safety cable at issue on a number of occasions but did not find evidence of a deteriorating condition. Bonvillan and Roberts made credible and forthcoming witnesses, but Ellard, a dedicated Ensco employee of 39 years, came across as biased and uncooperative. Thus, we afford little weight to answers given regarding his knowledge of the accident.

There is no doubt from the evidence that the light shield assembly was attached to the jackhouse by two tack welds which were intended to be temporary in nature. It is also without

question that the safety cable attached to the navigational light failed to prevent the assembly from falling to the deck and hitting Thibodeaux. What is without proof, is that Ensco failed to maintain the navigational light assembly and/or the safety cable and/or perform the maintenance in an unreasonable manner. The documentation from Ensco and its employees' testimony indicate they performed maintenance on a regular basis, and nothing within that evidence indicates the type of or manner in which Ensco conducted maintenance was substandard. Thibodeaux also failed to show the tack welds, though temporary in nature, were insufficient to hold the light assembly to the jack house. The navigational light assembly was tack welded to the jack house for thirty years but never budged or gave way under the weight of those inspecting it. It weathered salt water conditions but did not fall. The evidence of some rust on a safety cable was presented as to the starboard side navigational light safety cable, but nothing indicated the condition of the safety cable at issue.

### b. Failure to discover and remedy the tack welds

Thibodeaux also contends Ensco breached its duty to provide a safe work area because it failed to permanently weld the navigational light assembly to the jack house. Evidence presented to the court showed Ensco conducted regular inspections of the navigational light and at least quarterly inspections of the light fixtures. The regular inspections of the light required the electrician to support his weight on the light assembly at issue, yet the light assembly showed no signs of giving way.

For thirty years the port navigational light assembly on the Ensco 90 remained in place. During those thirty years numerous inspections were conducted by various crew members. However, no one noticed or documented the existence of, or any problems with these so called

"temporary" tack welds. Even when one leaned on the light assembly, nothing indicated the fixture was anything but secured to the jack house wall.

Common sense, and reasonable inferences from the evidence, indicate it would remain in that spot, in that condition, and undetected as being held by temporary welds but for being struck by the moving load on October 1, 2011. As such, the court cannot find Ensco breached a duty to permanently weld the light assembly to the jack house as Thibodeaux has failed to establish ENSCO knew or should have known the "temporary" welds existed or were in any way dangerous.

### c.     Failure to follow safe practices and procedures

#### i.     Ensco's practice of loading and storing take-on hoses

Thibodeaux also failed to provide evidence that the manner in which Ensco stored the take on hoses was unreasonable. Testimony from the witnesses indicated the hoses had always been stored in this manner and no similar accidents had previously resulted. These very men on this crane crew conducted this operation several times together and no one ever considered the manner in which things were conducted to be unsafe.

#### ii.     Failure to conduct a written job safety analysis

Contrarily, there is no disagreement that a written "job safety analysis" ("JSA") was required in this instance; if for no other reason that this was the first time the crew was performing this type of lift procedure on this hitch. However, testimony established a written JSA was not part of the crane crew's pre-job meeting. Thibodeaux testified that he generally obtained the JSA for the pre-safety meeting when he was a part of Puckett's crew. Biggs' testimony established that Puckett did conduct a verbal pre-job meeting to discuss the task and warned everyone to watch for a block hanging up during the lift.

Puckett was Thibodeaux's supervisor and he conducted the pre-job safety meeting; thus, we find he was responsible for ensuring the crane crew followed Ensco policies and procedures. Despite this finding, the court does not find Puckett's failure to follow policy caused the accident and/or injury. The crew members testified they performed this type of lift on a number of occasions with one another prior to this hitch. They further advised that they participated in the meeting that morning to go over the lift and the procedures that were involved. For reasons not explained, they simply didn't reduce the discussion to writing. Several witnesses also testified that Puckett was familiar with the tight spaces of the port-aft deck. However, no witness testified that a written job safety analysis would have differed in any substantial manner from Puckett's verbal directions. The court is left to conclude that the end result would have been the same regardless of whether Puckett, Thibodeaux, or anyone else performed a written job safety analysis that morning.

### iii. Puckett negligently maneuvered the crane to the left

As convincing as Biggs' testimony was that Thibodeaux turned his back to Puckett and quit signaling, the testimony is equally as convincing that Puckett, as the crane operator, swung the load to the left. Biggs testified it was the same action that Puckett successfully undertook during the course of the day to accomplish the task of laying out the hose. The record is clear that no one ordered an "all stop." We find either Thibodeaux or Puckett were the employees who had preventative responsibilities in that regard. In short, Thibodeaux should have called for one before turning his back and Puckett should have called one once Thibodeaux's back was turned to him. Even so, the task was almost complete and the men had performed it together without incident at least five times before. In this case, it is obvious they simply let their guard down, the load hit the navigational light assembly, knocked it loose from the jack house, and caused it to fall.

### d. Comparative negligence

Thibodeaux "is obligated under the Jones Act to act with ordinary prudence under the circumstances." Gautreaux, 107 F.3d at 339. In a Jones Act negligence action, the standard is that of a "reasonable seaman in like circumstances." Id.

The court finds, and Thibodeaux's injuries suggest, that he turned his back to the load and Puckett when he saw the hose falling into the walkway. Unable to see the light shield assembly, he was unaware it had been hit and was falling. His fellow crew members yelled out for him to run, but he was barely able to move before it fell from the jack house on his left and struck him on his left hip and knee. Thibodeaux, like Puckett, had the duty and opportunity to issue an all stop order, but he did not. As a result, he was injured, in substantial part by his own negligence, which we calculate at 50%.

### 2. Unseaworthiness

Thibodeaux contends the Ensco 90 was unseaworthy due to the condition of its appurtenances, gear and/or equipment. Specifically, he contends the port-side navigational light was unseaworthy because it was not attached to the light shield, only the light itself, and, because it was corroded, it failed. Thibodeaux also contends the light shield itself was unseaworthy as it was held by two temporary tack welds.

Thibodeaux bears the burden of proving that the Ensco 90 was unseaworthy because its appurtenances were "not reasonably fit for their intended use. The standard is not perfection, but reasonable fitness; not a ship that will weather every conceivable storm or withstand every imaginable peril of the sea, but a vessel reasonably suitable for her intended service." Mitchell v. Trawler Racer, Inc., 362 U.S. 539, 550 (1960) citing Boudoin v. Lykes Bros. S.S. Co., 348 U.S. 336 (1955). See also Liner v. J.B. Talley and Co., Inc., 618 F.2d 327, 330 (5th Cir.1980); Jackson

v. OMI Corp., 245 F.3d 525, 527 (5th Cir.2001); Phillips v. Western Co. of N. Am., 953 F.2d 923,

928 (5th Cir.1992). If proven, Thibodeaux would then have to establish "that the unseaworthy

condition was the proximate cause of his injury." Id. (Citations omitted). That is, he must establish

his injury was either a direct result of or a reasonably probable consequence of unseaworthiness.

Phillips v. Western Co. of North America, 953 F.2d 912, 817 (5th Cir.1992).

Thibodeaux contends the port-side navigational light shield assembly was unseaworthy

because it was tack welded rather than permanently welded to the rig. To repeat, the evidence

presented at trial showed the port-side navigational light shield assembly was tack welded

approximately 30 years before. Despite quarterly inspections of the light, no one ever noted the

welds were not permanent. Ensco never received a report of that navigational light shield assembly

or any other navigational light shield assembly falling on any of its jack-up rigs prior to the October

1, 2011 accident. The only reason the port-side navigational light shield assembly fell was because

it was struck by the load. No failure analysis was conducted on the port-side navigational light,

so there is simply no evidence showing the tack welds were in fact unseaworthy. Furthermore,

there is no evidence to suggest the tack welds' failure was a substantial cause of Thibodeaux's

injury. Rather, the evidence shows that the substantial cause of Thibodeaux's injury was the

apparatus that fell as consequence of his own failure to continue to maintain eye contact with the

load and a line of sight with Puckett.

Perfection is not the standard. The Ensco 90 was operational for thirty years before this

accident and during the entirety of its use, the navigational light remained tack welded to the rig.

At no time did the navigational light fail to perform the duty for which it was intended. It

illuminated the vessel when it was moved from place to place, apparently without incident. Thus,

we do not find that Thibodeaux established the navigational light was unseaworthy.

We do, however, find the safety cable attached to the navigational light was not reasonably fit for its intended use. The intended use for the cable was to prevent the navigational light from falling to floor of the rig and hitting someone, and in this case, it failed to work as intended. However, we do not find the Ensco 90 unseaworthy as a result of the safety cables lack of fitness for intended use. As explained above, Thibodeaux must also establish that the safety cables condition played a "substantial part" in causing his injury. As the court finds the combined negligence of Ensco, via Puckett, and Thibodeaux caused his injuries, we do not find the safety cable's failure played a "substantial part."

### 3. Maintenance and Cure

"Maintenance and cure is a contractual form of compensation afforded by the general maritime law to seaman who fall ill or are injured while in the service of a vessel." Jauch v. Nautical Servs., Inc., 470 F.3d 207, 212 (5th Cir.2006) citing McCorpen v. Cent. Gulf. S.S. Corp., 396 F.2d 547, 548 (5th Cir.1968). An employer has an obligation to provide maintenance and cure when a seaman is injured on a vessel regardless of fault. To receive maintenance and cure, a plaintiff must prove: (1) his employment as a seaman; (2) his illness or injury "occurred, was aggravated or manifested itself while in the ship's service, (3) the wages to which he may be entitled; and, (4) "the expenditures or liability incurred by him for medicines, nursing care, board and lodging." Smith v. Fla. Marine Transporters, Inc., 2011 WL 2580625, at *2 (E.D.La. 2011).

Maintenance, a per diem living allowance for food, lodging and transportation to and from a medical facility, and cure, payment of medical, hospital and therapeutic expenses, are owed until the seaman reaches maximum cure. See Alario v. Offshore Service Vessels, L.L.C., 477 Fed.Appx.186 (5th Cir.2012) citing Vaughn v. Atkinson, 396 U.S. 527, 531 (1973). Maximum cure is achieved when it appears probable that further treatments will not result in betterment of a

seaman's condition. <u>Rashidi v. American President Lines</u>, 96 F.3d 124 (5th Cir.1987). It is proper to declare maximum cure when a seaman's condition is incurable or that future treatment will relieve pain and suffering but not otherwise improve the seaman's condition. See <u>Barto v. Shore Const., L.L.C.</u>, 801 F.3d 465, 476 (5th Cir.2015).

As previously stated, the court found Thibodeaux reached maximum medical improvement with respect to his knee by October 18, 2011, his hip by May 17, 2013, and his back by September 13, 2016. Record evidence supports the court's finding that Ensco paid maintenance and cure in a timely manner through the trial.

Additionally, as the Ensco 90 was not found unseaworthy, Thibodeaux is not entitled in any event to past or future payments for Viagra.

We now turn to the question of whether social security disability payments can offset maintenance and cure payments made to Thibodeaux. There is no Fifth Circuit case which directly addresses the issue of off-setting social security disability insurance (SSDI) payments but there are cases which discuss set-off, in general, in the context of maintenance and cure.

As explained in <u>Davis v. Odeco, Inc.</u>, 18 F.3d 1237 (5th Cir.1994), "the collateral source rule is a substantive rule of law that bars a tortfeasor from reducing the quantum of damages owed to a plaintiff by the amount of recovery the plaintiff receives from other sources of compensation that are independent (or collateral to) the tortfeasor." <u>Id.</u> at 1243. However, the Court determined and consistently articulates the general rule that the "normal rules of damages, such as the collateral source rule in tort" should not be "strictly applied" in matters regarding maintenance and cure. <u>Id.</u> See also, <u>Gauthier v. Crosby Marine Serv. Inc.</u>, 752 F.2d 1085, 1089 (5th Cir.1985). "The owner of a vessel has a duty to pay maintenance and cure which is unrelated to any duty of care under tort law." <u>Id.</u> at 1246. That obligation sounds more in contract rather than tort.

18

In *Gauthier*, the Fifth Circuit examined whether medical insurance payments could be set-off from the maintenance and cure award Gauthier received.   The Court examined rulings from the U.S. Supreme Court and a few federal district courts and ultimately determined that where a seaman has not incurred any actual expenses, that is, he "lived off the charity of others or the public at large," he was not entitled to recover maintenance and cure. *Id.* citing, *Brown v. Aggie & Millie, Inc.*, 485 F.2d 1293, 1296 (5ᵗʰ Cir.1973); *Johnson v. United States*, 333, U.S. 46 (1948).  However, "where a seaman has alone purchased medical insurance, the shipowner is not entitled to a set-off from the maintenance and cure obligation moneys the seaman receives from his insurer." *Gauthier*, 752 F.2d at 1090.

The parties both note one federal case that specifically speaks to set off in the context of SSDI payments:  *Delaware River & Bay Authority v. Kopacz*, 584 F3d. 622 (3ʳᵈ Cir.2009).   In *Delaware River*, the Third Circuit relied in part on *Shaw v. Ohio River Company*, 526 F.2d 193 (3ʳᵈ Cir.1975) in reaching its conclusion that SSDI payments cannot be used to offset maintenance and cure.  The Court, citing *Shaw*, determined that SSDI payments were meant to replace wages, not living expenses or medical expenses; therefore, they were not the "exact equivalent" of maintenance and cure  and could not be used to off-set that obligation.  *Delaware River*, 584 F.3d at 631-632 quoting *Shaw*, 526 F.2d at 201.

Thibodeaux argues this court should apply *Delaware River*, to the facts of this case; whereas, Ensco argues that the case is not analogous to that before us as the Fifth Circuit does not have an "exact equivalent" standard.  Having considered both arguments and the case law before us, we decline to extend the reasoning of *Delaware River* to the instant case as it is not precedential to this court; the Fifth Circuit has never cited or discussed the case; the Fifth Circuit has not adopted the "exact equivalent" standard; and, the dicta in *Manderson v. Chet Morrison Contractors, Inc.*,

666 F.3d 373 (5th Cir.2012) leads us to conclude that it would not.   As stated in <u>Manderson</u>, the Fifth Circuit has consistently found that the collateral source rule appears "incompatible" with maintenance and cure; a seaman must "actually incur" expenses to receive maintenance and cure; and, "where a seaman has *alone* purchased medical insurance", the employer may not offset those payments from its maintenance and cure obligation.   <u>Manderson</u>, 666 F.3d at 380-82, quoting <u>Gauthier</u>, 752 F.2d at 1089.

In light of the general rules articulated by the Fifth Circuit, we would decline to apply the collateral source rule to the instant matter and would find the exception to that general rule inapplicable in this case as Thibodeaux did not "alone" pay into his SSDI credits.   An employee and employer both pay into SSDI.   That said, there is insufficient evidence to determine who paid what amounts toward Thibodeaux's SSDI credits and at what amounts to accurately determine and what, if any set off, is owed to Ensco.

In order to even be considered for SSDI, one must earn a minimum of 20 credits in a 10 year period.   We know that Thibodeaux earned all 20 credits, but his tenure with Ensco was too short to have earned all of those credits while employed with Ensco.   There is simply no evidence before the court showing how many credits Ensco paid into nor is there evidence of the amount which Ensco paid.   It would be complete conjecture for the court to proceed with any calculation; accordingly, Thibodeaux's SSDI payments shall not be offset.

**B. DAMAGES**

Thibodeaux seeks general and special damages including damages for past and future pain, suffering, mental anguish, post-traumatic stress disorder, depression and anxiety; disfigurement and physical disability; loss of enjoyment of life; past and future cure payments for Viagra as well and future medical expenses; future lost wages; and, interest through the date of trial.   Having

found liability, at least partially, on the part of Ensco, the court now addresses to what extent Thibodeaux is owed for all general damages (including pain and suffering), past and future unpaid medical expenses and past and future loss of earnings.

### A. Medical Expenses

Thibodeaux seeks damages to compensate for various medical expenses he has or will incur post trial. Among the expenses are past ($4,134.93) and future ($11,739) medical expenses for Viagra. The court denies an award for past or future expenses related to Thibodeaux's use of Viagra. There was no testimony that the Viagra was related to his back condition. Rather, Dr. Blanda connected it to Thibodeaux's use of pain medications, and testimony indicated Dr. Blanda suggested Thibodeaux ween himself from the use of opioid medications. Even at the time of trial, he had not.

In assessing the case, we do not find further psychological treatment is in the offing for Thibodeaux. As we observed, Thibodeaux's testimony lacks credibility as to his recovery.

Additional expenses to which Thibodeaux is entitled are: (1) physical therapy sessions Dr. Blanda recommended for the 4 to 6 weeks following trial, three times a week at a rate of $320 a session (a total of $4800); (2) a final CT scan ($750-$850) ordered by Dr. Blanda so he could definitively state whether Thibodeaux reached MMI; payments for quarterly visits to Dr. Blanda over the next two years at a cost of $250-$275 per visit (for a total of $2,100); and medication for pain management at a cost of $150-$175 per month for two years ($3,900 on average). Considering these calculations, Thibodeaux is entitled to an award of $11,600 for otherwise unpaid medical expenses, past, present and future.

## B. Lost Earnings

A plaintiff may recover damages for past and/or future lost earnings. Such lost earnings are generally lost wages, but, where proven, may include lost earning capacity. Past lost earnings are usually measured by the actual wage loss incurred by a seaman from the date of the accident through the date of trial. Future wage loss is calculated using a four step method established by the Fifth Circuit in Culver v. Slater Boat Co., 722 F.2d 114 (5th Cir.1983). The four step method includes: (1) estimating the loss of work life or expected remaining work life; (2) calculating the lost income stream; (3) computing the total lost income stream; and (4) discounting that total to present value. Id. at 117. The calculation must then consider taxes and reflect a net payment. Norfolk & W. Ry. V. Liepelt, 444 U.S. 490, 493-94 (1980).

Both parties provided reports from expert economists. The projections provided appear to be in line with one another except where assumptions are made regarding per annum cost of living increases. While R. Douglas Womack, PhD. provided a yearly increase of 2.5% a year, the joint report of Kenneth Boudreaux, PhD and John Page, Ph.D., CPA, provided a range for the possibility of a 1% decrease to a 1% increase per year. The court finds the use of the "reasonable range" is more practical than the 2.5% increase which we find to be inflated. We also find the detail and explanation provided by Drs. Boudreaux and Page logical and less academic.

The report from Drs. Boudreaux and Page included two possible results for economic damages. The first result showed calculations based on an annual income of $57,437.33 which represented Thibodeaux's earnings over the twelve months preceding the accident. The second result presumed a 25% reduction of that income which was intended to reflect the downturn in the oil and gas industry since 2014. The court finds the 25% reduction speculative and, thus, adopts the first result using the annual income figure of $57,437.33.

Using that annual income figure, Drs. Boudreaux and Page calculated a past loss of income, from the date of the accident through the date of trial, in the amount of $217,382.57. The court adopts this figure as the award to which Thibodeaux is entitled to compensate for past lost earnings.

As for future lost earnings, we note that the economists failed to consider any of the testimony garnered at trial. Specifically, we consider the testimony of Dr. Blanda who stated Thibodeaux would complete treatment two years post trial and would not be substantially limited in his abilities. Thus, we find a better calculation of future loss of earnings to be two years at full salary or $114,874.66.

### C. General Damages

Thibodeaux underwent a one level fusion at L4-5 and continues to experience persistent pain in his hip as a result of the Morel-Lavelle lesion. The relationship between the accident and Thibodeaux's surgery we find, is established by a bare preponderance of the evidence. The court finds an award of $320,000 to be an appropriate award based upon the quantum research submitted by counsel for both sides and our independent research.

### D. Prejudgment Interest

As the court's admiralty jurisdiction was invoked under Federal Rule of Civil Procedure 9(h) and because the case was tried to the bench, an award of prejudgment interest is within the discretion of the court. Williams v. Reading and Bates Drilling Co., 750 F.2d 487 (5th Cir.1972). See also Doucet v. Wheless Drilling, 467 F.2d 336 (5th Cir.1972); Bush v. Diamond Offshore Co., 46 F.Supp.2d 515, 523 (E.D.La.1999); and In re Parish of Plaquemines as Owner of M/V Pointe-A-La-Hache, 231 F.Supp.2d 506 (E.D.La.2002). The court finds that an award of prejudgment interest is not warranted in this case as Thibodeaux received maintenance and cure payments through trial and made no effort to mitigate his economic damages.

## V.     CONCLUSION

For the foregoing reasons, this court renders judgment in favor of Thibodeaux and against Ensco in the amount of $331,928.62 which reflects a total damages of $663,857.23 subject to Thibodeaux's own comparative fault assessed at 50%.

The parties are **ORDERED** to present a judgment agreed to as to form reflecting the ruling of this court within ten (10) days of receipt of this ruling.

**SIGNED** on this 28th day of December, 2017 at Alexandria, Louisiana.

JUDGE DEE D. DRELL
UNITED STATES DISTRICT COURT